# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| IN RE: ARTHUR T. ERHARDT, | ) | |
| | ) | |
| Debtor, | ) | No. 20 C 0006 |
| _____ | ) | Bankruptcy No. 19 B 31952 |
| | ) | |
| ARTHUR T. ERHARDT, | ) | Judge Sara L. Ellis |
| | ) | |
| Appellant, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| THOMAS BALDASSARRE, as executor | ) | |
| of the estate of Mary Baldassarre, decedent, | ) | |
| | ) | |
| Appellee. | ) | |

## OPINION AND ORDER

In June 2019, the Circuit Court of DuPage County ordered Debtor-Appellant Arthur T.

Erhardt to be incarcerated as a sanction for civil contempt. Erhardt was to remain in jail until he

turned over several items of Mary Baldassarre's ("Ms. Baldassarre") personal property to

Appellee Thomas Baldassarre ("Baldassarre"), the executor of Ms. Baldassarre's estate. Still in

jail five months later, Erhardt filed a Chapter 7 bankruptcy petition. Shortly thereafter, he asked

the bankruptcy court to enforce the automatic stay provided by 11 U.S.C. § 362 and sanction

Baldassarre for not seeking to obtain Erhardt's release from jail based on the stay. The

bankruptcy court denied Erhardt's motion, finding that Erhardt's continued incarceration was not

prohibited by the automatic stay. Erhardt now appeals that order.[1] Because the bankruptcy court

legally erred in determining that Erhardt's incarceration is outside the scope of the automatic

---

[1] The Court denies Erhardt's request for oral argument because the parties' briefs and the record
adequately present the facts and legal arguments, and oral argument would not significantly aid the Court.

stay, the Court vacates the bankruptcy court's order and remands the case for further proceedings in accordance with this opinion.

## BACKGROUND[2]

### I.    The Underlying State Trial Court Proceedings

Erhardt and Ms. Baldassarre were domestic partners for over three decades.  In May 2003, they jointly purchased a home (the "Residence").  The couple lived together until September 2016, when Ms. Baldassarre was diagnosed with an inoperable brain tumor.  After Ms. Baldassarre's hospitalization and biopsy surgery, she began living with her daughter, Denise Bosh-Williams.

Shortly after Ms. Baldassarre's diagnosis, conflicts arose between Erhardt and Ms. Baldassarre's children from her previous marriage, Baldassarre and Bosh-Williams.  In November 2016, Baldassarre and Bosh-Williams jointly petitioned for guardianship over Ms. Baldassarre in the Circuit Court of DuPage County.  Erhardt filed a counterpetition seeking guardianship over Ms. Baldassarre and the estate.  The following month, the state court appointed a guardian *ad litem*, set dates and times for Erhardt to visit Ms. Baldassarre, and affirmed Bosh-Williams' health care power of attorney.

In March 2017, Ms. Baldassarre discovered that since September 2016, Erhardt had been moving some of her money into accounts solely in his name.  Erhardt admitted this, and Ms. Baldassarre terminated their relationship.  A month later, on April 13, Ms. Baldassarre filed an emergency motion for entry of the Residence and return of her personal property, alleging that Erhardt had repeatedly denied her access to the home and her belongings.  The state court granted Ms. Baldassarre's motion on April 14 and ordered Erhardt to return specific items to Ms.

---

[2] The Court takes many of the underlying facts from the Illinois Appellate Court's opinion in *In re Estate of Baldassarre*, 2018 IL App (2d) 170996.  For ease of reading, the Court generally will not quote or cite to the opinion in reciting these facts.

Baldassarre, including her clothing, jewelry, baking items, and make-up. The same day, Ms. Baldassarre's children filed a citation to discover assets against Erhardt.

On April 20, the state court suspended Erhardt's power of attorney for property and froze all but one of his accounts, pending the turnover of certain financial documents. The court then conducted a hearing on the citation to discover assets on April 27. During the hearing, Erhardt admitted that after he had Ms. Baldassarre sign over the title to her vehicle, he had sold it for less than fair market value without telling her; that he had changed the locks and alarm codes to the Residence the previous fall; and that he had reviewed a letter from Ms. Baldassarre's counsel requesting the return of specific items of her personal property. Erhardt also testified that despite the April 14 order to turn over property, he had donated Ms. Baldassarre's baking items without her knowledge. The court ordered all parties not to remove any personal property from the Residence.

Later, at a hearing held on May 11, Erhardt testified that he did in fact possess Ms. Baldassarre's baking items, despite his previous testimony that he had donated them all. The state court ordered Erhardt to provide the garage access code for the Residence so that Ms. Baldassarre could pick up some of her items. On May 19, the parties entered into an agreed order that permitted Ms. Baldassarre to remove certain personal items from the Residence, and on June 1, Erhardt and Ms. Baldassarre entered into an agreed order listing the Residence for sale. The June 1 order also provided that Erhardt would return any property that he had removed from the Residence within 24 hours and provide the location of, and access to, all personal property that had been relocated from the house.

Ms. Baldassarre subsequently learned that Erhardt had cleaned out nearly all the property in the Residence, including many of the belongings that the state court had ordered to be returned

to her, without the court's permission and without notifying Ms. Baldassarre.  On August 9, Ms.

Baldassarre and her children filed a petition for a rule to show cause against Erhardt.  The

petition alleged that by removing all or substantially all of the personal property from the

Residence without returning it, Erhardt had violated the state court's April 27 and June 1 orders

and was in "indirect civil contempt."[3]  *In re Estate of Baldassarre*, 2018 IL App (2d) 170996,

¶ 12.  The same day, Erhardt filed an emergency motion to continue the hearing on the April 14

citation to discover assets based on an alleged potential Fifth Amendment issue.  The state court

continued the citation hearing and ordered that no property be removed from the Residence.

Ms. Baldassarre filed a citation to discover assets against Erhardt two days later, on

August 11.  Ms. Baldassarre alleged that Erhardt had removed, destroyed, or converted all of her

personal property in violation of the court's orders and had previously admitted that he gave

away some of her personal property and sold her car.  The citation included a list of personal

property that had not been returned to Ms. Baldassarre despite the court orders.

On August 23, the state court issued a rule to show cause against Erhardt and set a

hearing regarding any personal property not returned to the Residence for September 20.  At the

September 20 evidentiary hearing, the guardian *ad litem* and Bosh-Williams testified as to which

items of personal property had been inside the Residence, which items remained missing, and

who had access to the Residence and on what terms.  Erhardt did not present any evidence of his

own, and when he was called to testify, he asserted his Fifth Amendment right against self-

incrimination.

On September 22, the state court found Erhardt in "deliberate and ongoing indirect civil

contempt" of its April 27 and June 1 orders for removing and then failing to return numerous

---

[3] The characterization of contempt as "indirect" refers to the fact that the "alleged contemptuous conduct occurs outside the direct presence of a judge."  *Windy City Limousine Co. v. Milazzo*, 2018 IL App (1st) 162827, ¶ 40.

4

items of personal property to the Residence. *Id.* ¶ 17. Erhardt, however, could purge the contempt by returning "all missing items of personal property" to Ms. Baldassarre by the next court date. *Id.* Erhardt did not do so. Instead, he only returned some of the missing items of personal property to the Residence.

The state court thereafter held a hearing on December 6 to determine whether Erhardt had purged himself of indirect civil contempt. The court found that he had not and reiterated its holding that Erhardt was in "deliberate and ongoing indirect civil contempt" of its April 27 and June 1 orders by removing numerous items of personal property that were ordered not to be removed from the Residence and not returning them. *Id.* ¶ 19. On December 8, the court ordered Erhardt to serve 30 days' incarceration but stayed enforcement of this order until December 13 to again give Erhardt a chance to purge his contempt.

Erhardt appealed the state court's contempt finding and its order of incarceration. Erhardt also filed an emergency motion with the appellate court to stay the incarceration pending appeal. The appellate court granted Erhardt's emergency motion on January 2, 2018. Ms. Baldassarre passed away the following month.

## II.     Erhardt's Appeal and the State Trial Court's Subsequent Contempt Order

On appeal, Erhardt argued that because the contempt finding was criminal rather than civil, the state trial court had impermissibly made Erhardt prove that he was *not* in contempt. In the alternative, Erhardt argued that the civil contempt finding was an abuse of discretion because it "did not contain a valid purge provision or list the specific items that he must return." *Id.* ¶ 25.

The Illinois Appellate Court decided Erhardt's appeal on October 25, 2018. The appellate court affirmed the state court's contempt finding, which it found to be a finding of indirect civil contempt because "the dominant purpose for which the trial court imposed

5

sanctions was to secure [Erhardt's] compliance with the" April 27 and June 1 orders. *Id.* ¶¶ 29, 39. Critically, "[t]he trial court's actions were remedial and for [Ms. Baldassarre's] benefit," as opposed to "a punitive effort to vindicate the authority of the court." *Id.* ¶ 30. However, the appellate court found that the state court's 30-day sentence allowed Erhardt to "evade the coercive nature of the sanctions": if Erhardt was "willing to sit in jail for 30 days rather than turn over [Ms. Baldassarre's] personal property to her estate," the coercive effect of the contempt order was lost. *Id.* ¶ 39. The appellate court also noted that the state court's September 22 order, which stated that Erhardt could purge his contempt by returning all missing items of personal property, "did not specify the items that must be returned." *Id.* ¶¶ 17, 38. Thus, the appellate court vacated the sentence and remanded the case to "the trial court to enter a continuing and indeterminate sentence," as well as an order (1) providing that Erhardt "may purge himself of the contempt either before or during his imprisonment" and (2) listing "which specific items must be returned." *Id.* ¶ 39. Erhardt petitioned for leave to appeal the appellate court's decision, but the Illinois Supreme Court denied Erhardt's petition on January 31, 2019.

On June 5, 2019, the state court issued an "Order of Adjudication of Indirect Civil Contempt" in accordance with the appellate court's instructions for remand ("the June 5 Contempt Order"). Doc. 6-2 at 29. The June 5 Contempt Order remanded Erhardt to the county sheriff's custody for transfer to the county jail until he purged himself of his indirect civil contempt with respect to the April 27 and June 1 orders, and it explained that Erhardt could purge his contempt by tendering to Baldassarre every item listed on the attached exhibit, which listed 45 items or categories of items. The order also required Erhardt, "to more fully purge himself of contempt," to provide the court and Baldassarre with written inventories identifying the items that Erhardt had returned and those items that he had not returned. *Id.* at 30. It appears

that Erhardt began serving his sentence in the county jail shortly after the state court entered the June 5 Contempt Order.

## III.     Bankruptcy Court Proceedings

On November 8, 2019, a still-incarcerated Erhardt filed a voluntary petition for Chapter 7 bankruptcy.  At a November 12 status hearing before the state court, Erhardt's state court counsel informed the court of the bankruptcy filing and asked for Erhardt's release from jail. Baldassarre's counsel did not agree to the motion, and the state court judge did not grant the motion.  Later that day, Erhardt's bankruptcy counsel sent a letter to counsel for the guardian *ad litem* and Baldassarre demanding that their clients appear before the state court judge within 24 hours to obtain Erhardt's release based on the automatic stay provided by 11 U.S.C. § 362(a).

The demand fell on deaf ears, and on November 18, Erhardt filed a motion with the bankruptcy court titled "Motion to Enforce the Automatic Stay Entry of a Rule to Show Cause and for Other Relief Against" Baldassarre.  Doc. 6-2 at 19.  Erhardt argued that the automatic stay prohibited his continued incarceration and that Baldassarre was willfully violating the stay by failing to seek and obtain Erhardt's release from jail.  Erhardt's motion sought (1) an order requiring Baldassarre to show cause as to "why he should not be held in contempt for failing to seek or obtain the termination of [Erhardt's] incarceration" once he received notice of the bankruptcy filing, (2) an award of fees and costs pursuant to 11 U.S.C. § 362(k)(1),[4] and (3) an assessment of punitive damages ($5,000) for each day that Baldassarre failed to seek and obtain Erhardt's release or, alternatively, that such payment be made a condition, along with the release of Erhardt, for Baldassarre to purge himself of contempt.  *Id.* at 27–28.  At the November 22 hearing on the motion, Erhardt's counsel clarified that he was not asking the bankruptcy court to

---

[4] Erhardt referred to 11 U.S.C. § 362(h) as providing relief for a willful violation of the automatic stay, but § 362(h) was re-designated as § 362(k)(1) in 2005.  *In re Johnson*, 575 F.3d 1079, 1081 n.2 (10th Cir. 2009); *In re Glenn*, 359 B.R. 200, 202 n.2 (Bankr. N.D. Ill. 2006).

order the state court to release his client from jail; rather, he was asking for Baldassarre "to cease the enforcement" of the jail sentence. Doc. 7 at 6:15–23. The bankruptcy court continued the hearing until December 19, which allowed Baldassarre to file a written response and Erhardt to file a reply.

At the December 19 hearing, the bankruptcy court denied Erhardt's motion. The bankruptcy court concluded that Erhardt's incarceration was an "exercise of police and regulatory power" and therefore not prohibited by the automatic stay. Doc. 7-1 at 5:22–6:6, 6:19–23. As the bankruptcy judge bluntly put it: "[Erhardt] is disrespecting, dishonoring, violating and flaunting the state court orders, and that I do believe is not protected by the automatic stay, and that is my ruling. So I'm denying your motion." *Id.* at 11:11–15. The bankruptcy court entered an order the same day denying Erhardt's "Motion To Enforce" and "Motion for Rule to Show Cause" "for the Reasons Stated on the Record." Doc. 1-3 at 6 (Bankr. Doc. 32).

Erhardt timely appealed the bankruptcy court's December 19, 2019 order under 28 U.S.C. § 158(c)(2) and Bankruptcy Rule 8002(a).

## LEGAL STANDARD

Under 28 U.S.C. § 158(a)(1), this Court has jurisdiction to hear appeals "from final judgments, orders, and decrees" of a bankruptcy court. The Court reviews a bankruptcy court's findings of fact for clear error and its legal conclusions *de novo. Kovacs v. United States*, 739 F.3d 1020, 1023 (7th Cir. 2014).

## ANALYSIS

### I.    The Court's Appellate Jurisdiction

Before addressing the merits of Erhardt's arguments, the Court must confirm its jurisdiction over his appeal. *See Carroll v. Stryker Corp.*, 658 F.3d 675, 680 (7th Cir. 2011) ("[W]e have an independent obligation to satisfy ourselves that jurisdiction is secure before proceeding to the merits."). Erhardt's motion before the bankruptcy court requested three types of relief: a show-cause finding, an award of fees and costs under 11 U.S.C. § 362(k)(1), and an order requiring Baldassarre to pay $5,000 for every day that he failed to seek and obtain Erhardt's release from jail. These requests sought to sanction Baldassarre for his alleged willful violation of the automatic stay by finding him in contempt and making him pay damages under § 362(k).[5] *See Thompson v. Gen. Motors Acceptance Corp.*, 566 F.3d 699, 708 (7th Cir. 2009) (noting that a bankruptcy court may award sanctions under § 362(k) for a willful violation of the automatic stay); *Paloian v. Grupo Serla S.A. de C.V.*, 433 B.R. 19, 41 (N.D. Ill. 2010) ("[A] bankruptcy court may punish a violation of the automatic stay pursuant to its civil contempt powers[.]").

The bankruptcy court denied these requests because it determined that Erhardt's incarceration was not prohibited by the automatic stay. In doing so, the bankruptcy court implicitly concluded that Baldassarre had not violated the stay—he could not violate the stay if it

---

[5] A request for a show-cause finding does not actually ask for a contempt finding; it only seeks "an order requiring the nonmovant to show the court by a certain date why the court should not" make such a finding. *See S.E.C. v. Hyatt*, 621 F.3d 687, 695–96 (7th Cir. 2010). Nonetheless, "a district court may treat a show-cause motion as a motion for an order on the merits of the alleged contempt where doing so would not cause prejudice—that is, when it would not violate the alleged contemner's right to notice and an opportunity to be heard." *Id.* at 696. Here, Baldassarre had the opportunity to argue before the bankruptcy court why he did not violate the automatic stay, and he prevailed on that argument. Treating Erhardt's show-cause request as a request for a contempt finding therefore does not prejudice Baldassarre. Moreover, Erhardt's requests for damages and an order requiring Baldassarre to pay $5,000 per day to purge his contempt make clear that Erhardt sought much more than just a preliminary show-cause finding. He wanted a finding of contempt and the relief that accompanied that finding.

did not apply in the first place. An order finding that an individual has not violated the automatic stay is final and appealable. *In re Jones*, 369 B.R. 745, 747 (B.A.P. 1st Cir. 2007) ("A bankruptcy court's order determining whether there has been a violation of the automatic stay is a final order that supports appellate jurisdiction."). Moreover, by finding that the automatic stay did not apply to Erhardt's incarceration, the bankruptcy court essentially issued an order lifting the automatic stay as to that proceeding. *See Rajala v. Gardner*, 709 F.3d 1031, 1034 (10th Cir. 2013) (characterizing an order deeming § 362 inapplicable to judgment proceeds as "essentially an order granting relief from the automatic stay"); *In re Quigley Co.*, 676 F.3d 45, 51 (2d Cir. 2012) (finding that the bankruptcy court's decision on § 362's applicability was "the equivalent of a decision . . . on a motion seeking relief from a stay"). The bankruptcy court's order is final and appealable when viewed through this lens as well. *Ritzen Grp., Inc. v. Jackson Masonry, LLC*, 589 U.S. ---, 140 S. Ct. 582, 586 (2020) (holding that a bankruptcy court's unreserved grant or denial of a motion for relief from the automatic stay "yields a final, appealable order"); *In re Doctors Hosp. of Hyde Park, Inc.*, 337 F.3d 951, 954 (7th Cir. 2003).

The Court therefore concludes that it has jurisdiction over Erhardt's appeal. With jurisdiction confirmed, the Court proceeds to the merits of the appeal.

## II. The Applicability of the Automatic Stay

Although Erhardt identifies a number of issues that purportedly arise out of the bankruptcy court's order, the primary question before the Court is this: did the bankruptcy court err in concluding that Erhardt's continued incarceration is an exercise of police and regulatory power that is not prohibited by the automatic stay? Whether the Court views the bankruptcy court's conclusion as a denial of a motion for sanctions and contempt or as a grant of relief from the automatic stay, the standard of review is abuse of discretion. *See In re Sterling*, 933 F.3d

10

828, 832 (7th Cir. 2019) (civil contempt ruling); *In re United Air Lines, Inc.*, 438 F.3d 720, 734 (7th Cir. 2006) (decision to grant relief from an automatic stay). "However, a court necessarily abuses its discretion when its decision is based solely on an erroneous conclusion of law." *Colon v. Option One Mortg. Corp.*, 319 F.3d 912, 916 (7th Cir. 2003). The application of the automatic stay is a question of law that the Court reviews *de novo*. *Kovacs*, 739 F.3d at 1023; *N.L.R.B. v. P\*I\*E Nationwide, Inc.*, 923 F.2d 506, 512 (7th Cir. 1991).

"[F]iling a petition for bankruptcy automatically 'operates as a stay' of creditors' debt-collection efforts outside the umbrella of the bankruptcy case." *Ritzen*, 140 S. Ct. at 586. This automatic stay is governed by 11 U.S.C. § 362. *See In re Benalcazar*, 283 B.R. 514, 520–21 (Bankr. N.D. Ill. 2002). Subsection (a) to § 362 lays out the actions that are prohibited upon a filing for bankruptcy. 11 U.S.C. § 362(a)(1)–(8). Subsection (a), however, is subject to subsection (b), which lists several actions that are not prohibited by the automatic stay. *Id.* § 362(b)(1)–(28). Courts interpret the § 362(b) "exceptions narrowly to give the automatic stay its intended broad application." *In re Grede Foundries, Inc.*, 651 F.3d 786, 790 (7th Cir. 2011).

Erhardt first contends (without challenge from Baldassarre) that his continued incarceration satisfies § 362(a)(1). The Court agrees. Subsection (a)(1), in relevant part, applies the automatic stay to "the commencement or continuation . . . of a judicial, administrative, or other action or proceeding against the debtor that was . . . commenced before the commencement of the case under this title." 11 U.S.C. § 362(a)(1). Section 362(a)(1)'s broad language—"judicial, administrative, or other action or proceeding against the debtor"—encompasses the state court's contempt proceedings and Erhardt's resulting incarceration. *See Benalcazar*, 283 B.R. at 518–19, 529–30 (finding that § 362(a)(1) prohibited a creditor from continuing to pursue civil contempt proceedings it initiated in state court against the debtor before the debtor filed for

bankruptcy); *In re Atkins*, 176 B.R. 998, 1006 (Bankr. D. Minn. 1994) ("Section 362(a)(1) . . .

has to include proceedings for adjudications of civil contempt, where the act in question is the

debtor's alleged pre-petition violation of a court order."); 3 Collier on Bankruptcy ¶ 362.03[3]

(16th ed. 2020) ("The stay provision of subsection (a)(1) is drafted so broadly that it

encompasses all types of legal proceedings, subject only to the exceptions provided in section

362(b)."). Whether measured from the state court's first finding of civil contempt (September

2017) or the start of Erhardt's jail sentence for that contempt (June 2019), the actions or

proceedings at issue began well "before the commencement" of Erhardt's bankruptcy case. 11

U.S.C. § 362(a)(1). And these proceedings continue; indeed, Erhardt's continued incarceration

reflects the state court's ongoing effort to use its civil contempt power to make Erhardt comply

with its prior orders, which he has not yet done. *See In re Marriage of Carpel*, 232 Ill. App. 3d

806, 823 (1992) ("[T]he penalties in a civil contempt case serve only to coerce the contemnor to

comply with a court order, and they must cease when the contemnor complies. For instance, a

court may imprison [the contemnor] until [he] complies with the court order." (citation omitted));

*In re Moon*, 201 B.R. 79, 82–84, 90 (Bankr. S.D.N.Y. 1996) (finding that "the continued

enforcement of [a pre-petition] contempt order by incarceration of the debtor" violated

§ 362(a)(1)), *rev'd on other grounds*, 211 B.R. 483 (S.D.N.Y. 1997). The Court therefore

concludes that § 362(a)(1) encompasses the state court's civil contempt proceedings and

Erhardt's ongoing incarceration as part of those proceedings.

Even though Erhardt's incarceration satisfies subsection (a)(1), it is not prohibited if it

also satisfies one of the exceptions found in subsection (b). The parties agree that the bankruptcy

court relied upon § 364(b)(4) to deny Erhardt's motion. That exception provides that a stay

under § 362(a)(1) does not apply to

12

> the commencement or continuation of an action or proceeding by a
> governmental unit . . . to enforce such governmental unit's . . .
> police and regulatory power, including the enforcement of a
> judgment other than a money judgment, obtained in an action or
> proceeding by the governmental unit to enforce such governmental
> unit's . . . police or regulatory power.

11 U.S.C. § 362(b)(4). The state court's actions—holding a debtor (Erhardt) in civil contempt

and requiring him to serve a jail sentence until he purges his contempt—are actions or

proceedings by a "governmental unit." *Id.* § 101(27) ("governmental unit" includes an

"instrumentality of . . . a State [or] a municipality"). Thus, the question before the Court is

whether Erhardt's incarceration for civil contempt reflects the enforcement of the state court's

"police and regulatory power" under § 362(b)(4).

Courts have narrowly construed § 362(b)(4) "to apply to the enforcement of state laws

affecting health, welfare, morals and safety, but not to 'regulatory laws that directly conflict with

the control of the *res* or property by the bankruptcy court.'" *In re Cash Currency Exch., Inc.*,

762 F.2d 542, 555 (7th Cir. 1985) (citation omitted). Although the Seventh Circuit has not

directly addressed whether a debtor's incarceration for civil contempt reflects the use of a

government's "police and regulatory power," it has endorsed two tests for determining "whether

a state's actions fall within the scope of § 362(b)(4)—the pecuniary purpose test and the public

policy test." *In re Fulton*, 926 F.3d 916, 929 (7th Cir. 2019), *cert. granted sub. nom. City of

Chicago v. Fulton*, 140 S. Ct. 680 (Dec. 18, 2019).[6] "The pecuniary purpose test requires the

court to 'look to what specific acts the government wishes to carry out and determine if such

execution would result in an economic advantage over third parties in relation to the debtor's

---

[6] Because the City of Chicago's petition for certiorari did not seek review of the Seventh Circuit's rulings
regarding § 362(b)(4), the Court does not expect the Supreme Court's resolution of the case to affect the
Seventh Circuit's § 362(b)(4) analysis in *Fulton*. *See* Pet. for Cert., No. 19-357, at 14–15 n.6, *available
at* https://www.supremecourt.gov/search.aspx?filename=/docket/docketfiles/html/public/19-357.html
(Sept. 17, 2019 filing).

estate.'" *Id.* (citation omitted). If the government's acts are directed to health and safety concerns, § 362(b)(4) applies; if "the focus of the police power is directed at the debtor's financial obligations," however, the exception does not apply. *See id.* at 930 (citation omitted). "Alternatively, the public policy test considers whether the state action is principally to effectuate public policy or to adjudicate private rights." *Id.* The former meets the test, whereas the latter does not. *See id.*; *Chao v. Hosp. Staffing Servs., Inc.*, 270 F.3d 374, 385–86 (6th Cir. 2001). "Satisfying either test is sufficient for the [§ 362(b)(4)] exception to apply." *Fulton*, 926 F.3d at 929.

The Court must therefore determine the nature and purpose of Erhardt's incarceration under either test. In making this determination, the Court is guided by the Illinois Appellate Court's opinion, which held that the state court's contempt finding constituted a finding of civil contempt. *Estate of Baldassarre*, 2018 IL App (2d) 170996, ¶ 39. The appellate court found that the state court's actions "were remedial and for [Ms. Baldassarre's] benefit" and were imposed with the dominant purpose of securing Erhardt's compliance with the state court's prior orders. *Id.* ¶¶ 29, 30. The contempt orders were not, on the other hand, "a punitive effort to vindicate the authority of the court." *Id.* ¶ 30. Although the appellate court did not address the later-issued June 5 Contempt Order, the state court issued this order in accordance with the appellate court's instructions on remand, *see id.* ¶ 39, and there is nothing to indicate that this order meaningfully differs from the contempt orders the appellate court addressed in its opinion. The Court sees no reason to deviate from the appellate court's holding and findings with respect to the contempt proceedings at issue, which are governed by Illinois law.[7] *See Beck v. Dobrowski*, 559 F.3d 680,

---

[7] Throughout his briefing, Erhardt points out that the appellate court's opinion is the "law of the case" in the underlying state court case. True enough, but the "law of the case" doctrine does not apply to Erhardt's bankruptcy case, which is not the same case as the state court case. *People v. Bannister*, 378 Ill. App. 3d 19, 37 (2007) ("The law of the case doctrine bars relitigation of an issue already decided in the

686 (7th Cir. 2009) ("[S]tate courts are the authoritative expositors of their own state's laws.");

*MacDonald v. Estate of Gayton*, 469 F.3d 1079, 1081–82 n.1 (7th Cir. 2006) (following an

Illinois appellate court decision that addressed the same issue raised on appeal and noting that

"we defer to an Illinois court's interpretation of state law").

In light of the appellate court's opinion, the Court concludes that the state court's civil

contempt findings and Erhardt's accompanying incarceration do not satisfy the pecuniary

purpose test. As an initial matter, the test may not even apply because the state court is not a

traditional creditor seeking to recover a debt owed to it by Erhardt, which is "the type of conduct

that the pecuniary [purpose] test exists to prohibit." *In re Emerald Casino, Inc.*, No. 03-CV-

05457, 2003 WL 23147946, at *9 (N.D. Ill. Dec. 24, 2003); *see In re FirstEnergy Sols. Corp.*,

945 F.3d 431, 447 (6th Cir. 2019) (finding that the pecuniary purpose test did not apply because

the party taking action against the debtor had no pecuniary interest). But even if the test applies,

it is not met because the state court did not hold Erhardt in contempt and order him to jail

because of health or safety concerns. *See Fulton*, 926 F.3d at 930. Rather, the court did so as a

means of coercing Erhardt to turn over certain personal property to Ms. Baldassarre's estate.

Furthermore, to the extent any of this property is later determined to be part of Erhardt's

bankruptcy estate, Erhardt's compliance with the state court's orders would potentially hamper

---

same case. . . . Because the defendant's direct appeal and the postconviction proceedings are not the same case, the doctrine of law of the case does not apply here."). The appellate court's findings could be preclusive under theories of issue preclusion or judicial estoppel, but the Court does not consider these theories because Erhardt did not raise them until his reply. *See Darif v. Holder*, 739 F.3d 329, 336 (7th Cir. 2014) ("[A]rguments raised for the first time in a reply brief are waived."); *CSX v. Pac. Rail*, No. 07 CV 2738, 2010 WL 4736313, at *3 (N.D. Ill. Nov. 15, 2010) (explaining that "arguments raised for the first time in a reply brief are forfeited" because it denies the opposing party "any opportunity to address the issue"). In any event, because the Court finds it appropriate to defer to the appellate court's findings, it need not determine whether they are, in fact, binding or preclusive.

his creditors' ability to recover from the estate during the bankruptcy process.[8] *Cf. Fulton*, 926 F.3d at 930 (finding that the city's actions were focused on the debtors' financial obligation because they would give the city "an advantage over other parties interested in the debtors' estates").

The Court likewise finds that Erhardt's incarceration for civil contempt fails to pass the public policy test. The state court's civil contempt proceedings were not intended to effectuate some sort of public policy interest, such as the deterrence of litigation misconduct. *See, e.g.*, *In re Dingley*, 852 F.3d 1143, 1147–48 (9th Cir. 2017) (finding that civil contempt proceedings "intended to effectuate the court's public policy interest in deterring litigation misconduct" were exempt from the automatic stay under § 362(b)(4)). Instead, the state court's actions were primarily intended to adjudicate and enforce Ms. Baldassarre's private rights in the underlying guardianship proceedings. *See Fulton*, 926 F.3d at 930. As the Illinois Appellate Court explained, the state court's actions "were remedial and for [Ms. Baldassarre's] benefit." *Estate of Baldassarre*, 2018 IL App (2d) 170996, ¶ 30; *see also People ex rel. Chi. Bar Ass'n v. Barasch*, 21 Ill. 2d 407, 409 (1961) ("[C]ivil contempts are those prosecuted to enforce the *rights of private parties* and to compel obedience to orders or decrees for the *benefit of opposing parties*." (emphases added)).

Baldassarre contends otherwise by repeatedly asserting that the state court issued the June 5 Contempt Order to "uphold the dignity" of the court. Doc. 13 at 8, 17, 20, 25. Upholding the court's dignity is, of course, an important public policy. *See Kotowski v. Kotowski*, 3 Ill. App. 3d

---

[8] The Court is not suggesting that any of the personal property at issue should be part of the bankruptcy estate; that is for the bankruptcy court to decide. But Erhardt's briefing indicates his belief that he jointly owns at least some of the property. *E.g.*, Doc. 6-2 at 19 (asserting before the bankruptcy court that he jointly owned all or most of his non-exempt assets with Ms. Baldassarre, "including almost all personalty"); Doc. 15 at 5 (asserting on appeal that the items of property at issue are "largely" owned by Ms. Baldassarre and her estate). It is therefore possible that Erhardt's turnover of the property at issue could deplete his bankruptcy estate.

231, 234 (1971) (recognizing "the vital need to uphold the dignity of the court"). But Baldassarre does not cite any aspect of the record showing that the state court issued the June 5 Contempt Order for this reason. To the contrary, the Illinois Appellate Court expressly found that the state court's contempt orders "were *not* a punitive effort to vindicate the authority of the court." *Estate of Baldassarre*, 2018 IL App (2d) 170996, ¶ 30 (emphasis added). If the state court had been acting primarily to uphold its dignity, the appellate court likely would have found the contempt finding to constitute criminal contempt, which it did not do. *See id.* ¶ 27 ("[C]riminal contempt is an act committed against the majesty of the law in disrespect of the court or its process, and the court acts to preserve its dignity by punishing the wrongdoer." (citation omitted)); *Barasch*, 21 Ill. 2d at 409 (criminal contempt proceedings are "those directed to preservation of the dignity and authority of the court").

Baldassarre further points out that the June 5 Contempt Order requires Erhardt, if he returns the items at issue, to provide an inventory of these items to both Baldassarre and the state court. But this requirement does not in any way suggest that the state court issued the June 5 Contempt Order to reaffirm the court's dignity. Nor does it indicate that the purpose of the court's actions was no longer to coerce compliance for the benefit of Ms. Baldassarre's estate. At best, the inventory requirement simply provided a way for the state court to better monitor whether Erhardt has provided all the necessary items to Baldassarre.

Baldassarre also argues that the Seventh Circuit's decision in *Alpern v. Lieb*, 11 F.3d 689 (7th Cir. 1993), compels affirmance of the bankruptcy court's order. The Court disagrees. In *Alpern*, the plaintiff appealed an order requiring him to pay attorneys' fees as a sanction under Federal Rule of Civil Procedure 11 for filing a frivolous lawsuit. *Id.* at 689. While the appeal was pending, the plaintiff filed for bankruptcy and then sought to invoke the automatic stay to

17

stay the appeal. *Id.* The Seventh Circuit rejected the plaintiff's attempt on the basis "that a proceeding to impose sanctions under Rule 11 is exempt from the automatic stay" under § 362(b)(4). *Id.* at 690. The *Alpern* court reasoned that although Rule 11 sanctions are typically sought by a non-governmental litigant, the litigant "can be viewed as an agent of the 'governmental unit,'" the federal court. *Id.* The court then imposes the sanctions to punish unprofessional behavior and conduct in litigation. *Id.* The *Alpern* court concluded its analysis with the following observations:

> A litigant should not be allowed to delay the imposition of sanctions indefinitely by the expedient of declaring bankruptcy. Allowing him to do so would not only increase the number of bankruptcy filings but also create incentives for unprofessional conduct in litigation by firms or individuals teetering on the edge of the bankruptcy abyss.

*Id.*

The Rule 11 sanctions *Alpern* found to be encompassed by § 362(b)(4), however, substantively differ from the state court's civil contempt orders here. "A civil contempt order has much different purposes than a Rule 11 sanction." *Willy v. Coastal Corp.*, 503 U.S. 131, 138–39 (1992). Rule 11 is designed to deter litigation misconduct and punish parties who have already engaged in misconduct. *Id.* at 139; *Corley v. Rosewood Care Ctr., Inc. of Peoria*, 388 F.3d 990, 1013 (7th Cir. 2004). Pursuing these goals through Rule 11 sanctions reflects the exercise of a court's regulatory power. *See In re Commerce Oil Co.*, 847 F.2d 291, 296 (6th Cir. 1988) ("Punishing wrongdoers[ and] deterring illegal activity . . . are exercises of the state's regulatory power to effectuate public policy and are not actions based upon the state's property interests."); *Benalcazar*, 283 B.R. at 533 (punishing and deterring frivolous pleadings "can reasonably be seen as the pursuit of a regulatory governmental interest"). In fact, the Seventh Circuit has recognized that *Alpern*'s holding regarding § 362(b)(4) was based on the "regulatory"

component of the sanctions at issue. *See In re Maurice*, 73 F.3d 124, 128 (7th Cir. 1995). In contrast, the motivation for the state court's June 5 Contempt Order and related contempt findings was not punishment, deterrence, or some other broad regulatory interest. It was "to force the contemnor to comply with an order of the court" for the benefit of Ms. Baldassarre, a private party. *Willy*, 503 U.S. at 139; *Estate of Baldassarre*, 2018 IL App (2d) 170996, ¶¶ 27, 29, 30. Based on these substantive differences between the Rule 11 sanctions in *Alpern* and the state court's civil contempt actions here, *Alpern* does not require the application of § 362(b)(4).[9]

To be sure, the Court recognizes that holding § 362(b)(4) inapplicable to civil contempt proceedings like those at issue here may incentivize civil contemnors to use bankruptcy as a means to avoid (or at least delay) atoning for their contempt. *Cf. Alpern*, 11 F.3d at 690 ("A litigant should not be allowed to delay the imposition of sanctions indefinitely by the expedient of declaring bankruptcy."). But however undesirable this result, it is the one compelled by a proper § 362(b)(4) analysis in these circumstances, especially considering the narrow construction that courts are to give § 362(b)(4) and the other subsection (b) exceptions. *See Fulton*, 926 F.3d at 927, 929; *see also Bethea v. Robert J. Adams & Assocs.*, 352 F.3d 1125, 1128 (7th Cir. 2003) ("[T]he judiciary's job is to enforce the law Congress enacted, not write a different one that judges think superior."). Moreover, the Court notes that there may be other grounds upon which a bankruptcy court can lift the automatic stay when a debtor attempts to use bankruptcy for no other reason than to avoid complying with a civil contempt order. *See, e.g.*, 11

---

[9] Baldassarre suggests that *Alpern* has broader application because in *Cleveland Hair Clinic, Inc. v. Puig*, 106 F.3d 165 (7th Cir. 1997), the Seventh Circuit cited *Alpern* to support the following statement: "[u]se of the contempt power is an appropriate way to enforce a sanction for misconduct, which is not an ordinary money judgment." *Id.* at 166. But *Alpern* did not address a situation where the district court used its contempt power, so the Court reads *Cleveland Hair* as citing *Alpern* only to support the latter part of the quoted statement—that a sanction for misconduct is not an ordinary money judgment. This proposition does not bear on the lack of similarity between the nature and purpose of the Rule 11 sanctions addressed by *Alpern* and the civil contempt actions here.

U.S.C. § 362(d)(1) (bankruptcy court may terminate the automatic stay "for cause"); 3 Collier on Bankruptcy ¶ 362.07[3][a] (16th ed. 2020) ("[R]elief might be granted [from the stay] when the court finds that the debtor commenced the case in bad faith."); *see also In re Bovino*, 496 B.R. 492, 502 (Bankr. N.D. Ill. 2013) (identifying the debtor's "good or bad faith" as a factor in determining whether cause exists to lift or modify the automatic stay).

In sum, Erhardt's ongoing jail sentence as part of the state court's civil contempt proceedings does not satisfy either the pecuniary purpose test or the public policy test, and it is not governed by *Alpern*. Therefore, the Court must conclude that the bankruptcy court legally erred in determining that Erhardt's continuing incarceration falls within the scope of § 362(b)(4).

## III.  Remaining Issues

Two issues remain. First, Erhardt seeks an award of sanctions under 11 U.S.C. § 362(k) for Baldassarre's willful refusal to cease and desist from enforcing the state court's contempt order. The Court denies this request. Erhardt did not make any substantive arguments on appeal regarding his entitlement to sanctions under § 362(k), so he has forfeited any request for this relief as part of his appeal. *See, e.g.*, *Shipley v. Chi. Bd. of Election Comm'rs*, 947 F.3d 1056, 1063 (7th Cir. 2020) ("Arguments that are underdeveloped, cursory, and lack supporting authority are waived."); *Otto v. Variable Annuity Life Ins. Co.*, 134 F.3d 841, 854–55 (7th Cir. 1998) (refusing "to consider unsupported or cursory arguments"). In addition, because the bankruptcy court determined that the automatic stay did not apply, it did not have occasion to consider this issue in the first instance. *See Singleton v. Wulff*, 428 U.S. 106, 120 (1976) ("It is the general rule . . . that a federal appellate court does not consider an issue not passed upon below.").

Second, Erhardt asks the Court to instruct the bankruptcy court to direct Baldassarre to "take all steps necessary to secure the immediate release of [Erhardt] from incarceration." Doc. 11 at 24. The Court denies this request as well. The Court leaves it to the bankruptcy court to decide what actions it should take on remand given the Court's ruling that Erhardt's incarceration does not fall within 11 U.S.C. § 362(b)(4).

## CONCLUSION

For the foregoing reasons, the Court vacates the bankruptcy court's December 19, 2019 order denying Erhardt's motion to enforce and to show cause and remands the case to the bankruptcy court for proceedings in accordance with this opinion.


Dated: July 15, 2020

_____
SARA L. ELLIS
United States District Judge